69 N.J. Super. 198 (1961)
174 A.2d 90
PEARL ASSURANCE COMPANY LIMITED, A CORPORATION, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
BERTHA D. WATTS, JESSIE F. GALLAGHER AND CHARLES GALLAGHER, HER HUSBAND, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Submitted March 6, 1961.
Decided May 26, 1961.
*200 Before Judges GOLDMANN, FOLEY and LEWIS.
Mr. Lawrence N. Park, attorney for appellants.
Mr. Neil F. Deighan, Jr., for respondent (Messrs. Kisselman, Devine & Deighan, attorneys).
The opinion of the court was delivered by FOLEY, J.A.D.
Defendants appeal from a declaratory judgment adjudicating that defendant Bertha Watts breached a policy of insurance issued to her by plaintiff insurance company, that the company therefore owed to her no obligation to defend an action brought against her by defendants *201 Gallagher, and absolving the company from all liability under the policy. Plaintiff cross-appeals from an adverse holding by the trial court with respect to one of the grounds upon which it asserted its nonliability. The historical background of the case is detailed in Pearl Assurance Co. Ltd. v. Watts, 58 N.J. Super. 483 (App. Div. 1959), and the factual recital therein is adopted for the purposes of this opinion.
Briefly stated, in the prior case in which Milton S. Watts was also a defendant, plaintiff sought a judgment declaring that both he and Bertha Watts, his wife, had given inconsistent statements to the insurance company and had thereby breached the cooperation clause of the policy. The trial court found for the defendants.
On appeal we affirmed the judgment as to Mrs. Watts since at the time the action was brought she had given to the company but one statement. However, we held, contrary to the finding of the trial court, that Mr. Watts had given inconsistent statements and we remanded the case for a determination of whether such statements were deliberately made, and also whether he was guilty of fraud and collusion as plaintiff charged.
Shortly thereafter the present case was instituted. To crystallize the issues therein, we set forth verbatim the allegations in the complaint which are made the basis of plaintiff's charge that Bertha Watts breached her agreement to cooperate with the company in defense of any claim within the coverage of the policy:
"* * * During the preparation of the defense in the action against Milton S. Watts and Bertha D. Watts, the defendant Bertha D. Watts gave a statement and approved and acquiesced in statements as to conditions concerning property owned by her and Milton S. Watts, and subsequently the defendant Bertha D. Watts made an inconsistent and contradictory statement, and said Bertha D. Watts has assisted Jessie F. Gallagher and Charles Gallagher to present their claim and prosecute the action against Milton S. Watts and Bertha D. Watts; has colluded with Jessie F. Gallagher and Charles Gallagher; has given irreconcilable factual statements concerning *202 liability; has given information and statements to Jessie F. Gallagher and Charles Gallagher and their representative, and said Bertha D. Watts has further failed to disclose entirely facts concerning the condition of the property." (Paragraph 6)
The case was presented to the trial court on documentary evidence which included a statement made by Bertha D. Watts on January 6, 1958, depositions of Jessie Gallagher and Mrs. Watts dated October 10, 1958, and a second deposition given by Mrs. Watts on April 26, 1960.
The issues which the trial court was called upon to decide were purely factual. They were: (1) whether there existed inconsistencies between Mrs. Watts' statements of January 6, 1958 and her deposition of October 10, 1958 which constituted a breach of the cooperation clause in the policy; and (2) whether she colluded with defendants Gallagher in the maintenance of their action against her, and thereby perpetrated a fraud upon the insurance carrier.
On January 6, 1958 Mr. and Mrs. Watts appeared at the office of plaintiff's attorneys. Mr. Watts was interrogated at length and a transcript of his statement was taken stenographically by a certified shorthand reporter. He denied knowledge prior to the accident of the defect in the Wattses' premises upon which the Gallagher action was predicated. At the conclusion of the interview, Mrs. Watts was briefly examined as follows:
"Q. You have been present while I have been questioning Mr. Watts. Is there anything you want to add to this that we didn't cover? A. No, I don't think so.
Q. Is there any information that you have that Mr. Watts didn't bring out, or anything you know about this accident, or the circumstances surrounding it, that are different than what Mr. Watts told us? A. No. The only thing I know, she went to grab the rail and as she did it broke loose and she lost her balance and went down the stairs.
Q. Had you taken particular notice of that rail before your mother fell? A. I had no occasion to use it. I just went up and down the steps and never paid any attention to it.
Q. You never examined it to see whether it was solidly anchored, or anything loose about it? A. No.
*203 Q. You had no knowledge of it? A. The only thing I did notice, where it is connected to the house on that round plate the pipe goes into, there is a space for four screws and only two were in there.
Q. Were they the original two that were put in there, as far as you know? A. Yes.
Q. There had never been four screws in there? A. No.
Q. I guess they ran short that day. Do you have children? A. Yes."
When Mrs. Watts was examined under oath on October 10, 1958, she deposed as follows:
"Q. Do you recall on January 6th, 1958, when you were asked to come to this office and see Mr. DeLuca and answer interrogatories? A. Yes.
Q. Do you recall that? A. Yes.
Q. And you and Mr. Gallagher were present? A. No, myself and my husband.
Q. I am sorry, you and Mr. Watts were present? A. Yes.
Q. And at that time Mr. DeLuca asked you information concerning the accident and the prior knowledge you had of the accident, do you recall that? A. I recall some of it.
Q. And I believe, subsequently, you signed interrogatories that were asked by Mr. Moss, do you recall that? A. Yes.
Q. Mrs. Watts, did you have any knowledge of the defective condition of this railing prior to the time your mother fell on August 5th, 1957? A. Yes, we did.
Q. Do you recall whether you told that to Mr. DeLuca you had prior knowledge? A. I believe I told him as far as being defective, we couldn't actually say it was defective in the sense it was leaning over as it was after the accident. I believe we told him it was loose and wasn't properly installed.
Q. Did you tell him it was wobbly? A. I don't remember that.

* * * * * * * *
Q. And you are not certain as to whether it was in bad condition or not? A. I knew there was some talk about the screws being missing at the back of the railing, and the fact hot lead was poured into the cement, which they didn't think should have been done, but other than that I don't know anything about it. As far as the construction of it was, I couldn't say."
On October 10, 1958 plaintiff also took the deposition of Jessie Gallagher, mother of Mrs. Watts, and devoted considerable attention to the circumstances under which she had brought and maintained her action against the defendants. *204 The obvious design of this portion of the examination was to create by inference the idea that she and Mr. and Mrs. Watts had fraudulently contrived to render aid to her to the detriment of the insurance company. The essence of her deposition is that she brought the suit with knowledge gained from the Wattses that they were insured against a loss and that she would not have brought it if they were not insured.
On April 26, 1960 plaintiff took Mrs. Watts' deposition in the present case. Here, emphasis was laid on her knowledge of the missing screws first mentioned by her on January 6, 1958; the use to which she and her family had put the handrail prior to the accident; discussions, if any, she had with her mother relative to instituting an action against her husband and herself; and what information, if any, she had given to her mother after the accident respecting the antecedent condition of the handrail. We find nothing in her testimony concerning the handrail which was in disaccord with her deposition of October 10, 1958.
In awarding judgment to the plaintiff the trial court said that he was "not finding that plaintiff is entitled to a judgment on the basis of an inconsistent statement" but "the depositions [sic] of January 6, 1958 placed upon Mrs. Watts a duty to reveal any information that she had, even though the question in its true essence did not ask that," and further that:
"In the depositions taken on April 26, 1960, the answers given by Bertha Watts as to whether or not this matter was discussed with her mother, as to whether or not there was a revelation as to the fact of insurance, the amount of insurance, and the manner in which the accident happened, whether the railing was loose or not loose, or whether it was a question of these screws not being there, and, finally, something that had never been disclosed before, the size of the steps, all indicate to me that this defendant has not been acting fairly and properly with the insurance company, and, under the clause requiring cooperation, it is my determination that the answers that she has given, and the attitude which she has shown of cooperation with her mother rather than the insurance company  again, which are perhaps natural and normal, but which *205 should have been fully disclosed  lead me to the conclusion that she is not cooperating with the insurance company in the manner required by the clause in the policy, and, therefore, a judgment on the basis of fraud and collusion will be rendered in favor of the plaintiff."
The defendants urge that upon the record before him the trial judge erroneously concluded that Mrs. Watts was guilty of fraud and collusion and ask that we assume original jurisdiction and make new findings of fact under R.R. 1:5-4. Plaintiff opposes our so doing, but asks that should we take this course, we reverse the trial court's inferential finding that Mrs. Watts' statement of January 6, 1958 and her deposition of October 10, 1958 were not inconsistent.
It is well settled that a reviewing court should exercise its original fact-finding jurisdiction sparingly and in none but a clear case, where there is no doubt about the matter. Greenfield v. Dusseault, 60 N.J. Super. 436, 444 (App. Div. 1960), affirmed 33 N.J. 78 (1960); R.R. 1:5-4. However, it is also recognized that "the rules of court permit a greater scope of appellate review in a non-jury case and that we may make new or amended findings of fact in such cases." "And where the subordinate facts are not in dispute and credibility is not involved, the findings of the court below are not as weighty as they would otherwise be." Id.
We are not hampered here by the properly recognized advantage of the trial judge to determine the credibility of witnesses, gained from their presence in the proceeding. We have before us precisely the same record as was presented to the trial court. Moreover, the questions for determination turn not upon the resolution of disputed facts, but rather upon the legal consequences of the factual complex when applicable rules of law are applied thereto. As we stated in Kavanaugh v. Quigley, 63 N.J. Super. 153, 158 (App. Div. 1960), where the trial judge misapplies the law to the facts, it is the duty of the reviewing court to adjudicate the controversy in the light of applicable principles in order that a manifest denial of justice be avoided. Service *206 to this principle requires that we invoke R.R. 1:5-4 in this case.
The casual manner in which Mrs. Watts was asked on January 6, 1958 whether she wished "to add to" her husband's statement without directing her attention to any particular part of it, and the acceptance of her answer, "No, I don't think so," do not lend themselves well to the claim that her subsequent affirmations were inconsistent with what she had previously said. Moreover, it is noted that her mention of the missing screws did not stir the curiosity of the questioner. This provokes the query of whether the true purpose of the unusually formal method of investigation employed by plaintiff  that is, the use of a certified shorthand reporter  was to bind Mrs. Watts to an exculpatory statement rather than legitimately to seek information.
In order to relieve an insurer of liability under a policy, the cooperation clause must be deliberately breached in a material and essential particular. Pearl Assurance Co. v. Watts, supra, 58 N.J. Super., at page 490. Thus, as a minimum it must appear that allegedly inconsistent statements were deliberately made. Id., 58 N.J. Super., at page 495. We find as a fact that the allegedly inconsistent statements of Bertha Watts, so tested, were not such as to constitute a breach of the cooperation clause in the policy.
We further find that the charge of fraud and collusion leveled at Mrs. Watts was not sustained by the evidence. Fraud is never presumed and the burden is on one asserting it to prove it clearly and convincingly by direct or circumstantial evidence. Camden Safe Deposit & Trust Co. v. Green, 124 N.J. Eq. 221, 225 (Ch. 1938). Circumstances that are merely suspicious will not support an inference of fraud. Hersh v. Levinson Bros. Inc., 117 N.J. Eq. 131, 135 (E. & A. 1934).
The law recognizes that the evidence should be examined with great particularity where members of one family are suing, and this because of a tendency, wittingly *207 or otherwise, to color testimony favorable to the plaintiff. 8 Appleman, Insurance, § 4778 (1942). See Buckner v. Buckner, 207 Wis. 303, 241 N.W. 342 (Sup. Ct. 1932). But the fact that the insured's sympathy is with injured members of his family, and that there is an ordinary friendly relationship between them, does not of itself furnish evidence of fraud and collusion. State Automobile Mut. Ins. Co. of Columbus, Ohio v. York, 104 F.2d 730 (4 Cir. 1939), certiorari denied 308 U.S. 591, 60 S.Ct. 120, 84 L.Ed. 495 (1939).
That the Gallaghers might not have brought the action against their kin but for the insurance coverage is understandable. Parents do not ordinarily enforce their rights against their children where the usual relationship of affection exists, and when by doing so they will inflict financial hardship upon them. And it would be unnatural for a daughter not to wish her mother to have the same benefits of the insurance which she purchased as would a stranger, if the mother suffered injury as a result of the daughter's negligence. To equate these human reactions to collusion, and to infer that designedly and with fraudulent intent Mrs. Watts withheld information from the carrier for the purpose of cheating it, in our judgment would be manifestly unjust in the circumstances presented.
Accordingly the cross-appeal is dismissed and the case remanded to the trial court for the entry of judgment in favor of the defendants, and in conformity with this opinion.