# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4864-18T2

A.C.-G.,

    Plaintiff-Appellant,

v.

A.C.,

    Defendant-Respondent.

_____

Argued telephonically December 20, 2019 –
Decided February 4, 2020

Before Judges Yannotti and Currier.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FV-20-1523-19.

Michael A. Kaplan argued the cause for appellant (Lowenstein Sandler LLP, attorneys; Michael A. Kaplan, Shontae Denise Gray, and Rachel Deborah Moseson, on the brief).

Respondent has not filed a brief.

PER CURIAM

Plaintiff A.C.-G. appeals from the denial of her application for a final restraining order (FRO) under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Because the Family Part judge erred in her determination that defendant A.C.'s actions did not constitute a predicate act of domestic violence, we reverse.

We derive the following facts from the parties' testimony at trial. The parties have been in a relationship since 2001; they were married in 2004 and have two children together.

In 2001, when plaintiff was about eight months pregnant, defendant struck her in the face and verbally abused her. She testified that for the next eleven years, whenever defendant was angry or drunk, or if they argued, defendant physically abused her by pushing or slapping her; she was too afraid of him to report the abuse to police.

In 2012, defendant grabbed plaintiff by her throat, "pushed [her] up against a wall, and . . . broke the wall with [her] head." She said she was unable to breathe. Although plaintiff obtained a temporary restraining order (TRO), it was later dismissed.

In 2018, while outside their home, defendant threw keys at plaintiff's face, which struck her and left a mark. Plaintiff testified that, in another incident,

defendant dragged her by the hair from their children's bedroom into his bedroom and raped her. After this, plaintiff frequently slept in the children's room to avoid being raped again.

In April 2019, defendant pushed and threatened to physically assault plaintiff. In May 2019, plaintiff told defendant she wanted a divorce. Defendant became angry and demanded to have sexual intercourse with her. When plaintiff refused, defendant became enraged, struck her repeatedly, turned her on her back and attempted to forcibly sodomize her.

There was a physical struggle. Defendant strangled plaintiff and had sex with her against her will. Defendant then hit plaintiff on her legs. Plaintiff started sleeping on the living room couch to avoid being further assaulted.

On May 24, 2019, at 2 a.m., plaintiff was sleeping on the living room couch next to her visiting niece when defendant took her cellphone and violently woke her, demanding the passcode. When plaintiff refused to give it to him, defendant became enraged, grabbed plaintiff from the couch, pushed her into the bathroom, and locked the door. Defendant then "put both hands [on her] throat . . . [and] pushed [her] up against the wall three times very badly."

Plaintiff testified that defendant slapped, scratched and strangled her until she could not breathe, and she urinated on herself. While strangling plaintiff,

defendant stated he was going to "chop [her] up, . . . [and] put [her] in a garbage bag. He [said he] wasn't going to leave any trace [of her], and . . . he was going to put [her] outside." Defendant also said that "if [they] were in Guatemala . . . , [he] would just f*** her over."

Plaintiff testified that as she was being strangled, she believed defendant "wanted to kill [her] at that time." After the parties exited the bathroom, defendant threw a bottle of water at plaintiff's face, but she dodged it. He kept plaintiff's cell phone and went to bed, so she could not call the police to report the incident.

Plaintiff's niece also testified, confirming plaintiff's account that defendant pulled plaintiff up from the couch, "took her to the bathroom . . . . [and] pushed her up against the wall." Although the niece was not inside the bathroom during the attack, she heard plaintiff's body striking the wall.

A few minutes after the incident, the niece went into the bathroom to check on plaintiff. After seeing that plaintiff's neck was very red, the niece took photographs of the bruises, scratches, and redness on plaintiff's neck, chest, and arms. The niece did not call the police to report the incident because she was afraid of defendant.

4

Later that morning, the niece sent the pictures to plaintiff, who saved them on her phone on May 24, 2019 at 10:14 a.m. The niece deleted the pictures from her own phone several days later.

In his account of the events of May 24, defendant stated that around 11 p.m., plaintiff and her niece were on the couch talking when plaintiff and defendant started to argue about plaintiff's phone passcode and alleged infidelity.[1] Plaintiff slapped him twice and, in response, defendant put his hands on her shoulders and pushed her twice, once toward the bathroom and then against the bathroom wall.

He denied strangling her, explaining he was a "right-handed person . . . [and] not a left-handed person." He also denied causing the injuries depicted in the photographs, stating: "[B]ecause I put my hands on her shoulders, not [o]n her neck."

When the judge asked defendant if he threatened to cut plaintiff up in pieces and put her body in garbage bags, defendant answered: "No. Yeah, she . . . was following me asking me to hit her, [because] she said she was going to call the police and she was going to have me deported . . . which was the best

---

[1] The parties frequently argued about plaintiff's phone use because defendant claimed plaintiff was using the phone to communicate with other men, which she denied.

thing possible." He also stated he told plaintiff that "if [they] were in Guatemala, she wouldn't do these stupid things that she was doing, hiding herself in the bathroom with a phone." Sometime following the incident, defendant sent plaintiff a text message threatening to commit suicide.

After plaintiff dropped her children off at school, she reported the assault to police around 9:30 a.m. and obtained a TRO. Plaintiff amended the TRO on June 19, 2019 to include the prior history of domestic violence.

Plaintiff told the judge she needed an FRO because she was afraid of defendant and believed he would continue to be physically violent toward her: "He's very violent. . . . He can't control himself. He doesn't know how to control himself."

Following the trial, the judge denied plaintiff's application for an FRO, finding in an oral decision that plaintiff failed to establish a predicate act of domestic violence. Although the judge did not make any specific credibility findings, she noted the contrast in the parties' version of events and questioned the timeline of events. She stated, "[t]he only thing that the parties do agree on . . . is that on May [24], 2019, they had an argument and that [defendant] wanted [plaintiff's] [phone] password."

A-4864-18T2

The judge also said she was "troubled" by the photographic evidence. Although plaintiff and her niece both testified the pictures of plaintiff's injuries were taken immediately after the assault, the timestamps on the photos admitted into evidence said they were captured at 10:14 a.m.

In her decision, the judge found it did not "make any sense" to her that plaintiff's niece was "too afraid to call the police" directly after the incident. She stated:

> Certainly if [plaintiff] was injured to the extent she was injured by [defendant], the police would have been called, or certainly [her niece] wouldn't have had the opportunity to immediately go in the bathroom and take pictures, if [defendant] was going to do something immediately. The timeline does not make any sense to this [c]ourt. . . . [b]ecause what I was told is that these pictures were taken right away, in the bathroom, as soon as this occurred. . . . If she had time to go in the bathroom because he strangled her to the extent that she said she couldn't breathe, threw her up against the wall, and then [defendant] just . . . goes to bed and her niece takes pictures, and no one thinks to go to the police at the time, it doesn't make sense to this [c]ourt, and I'm very troubled by the testimony and the way it was presented.

On appeal, plaintiff contends she presented sufficient evidence establishing several predicate acts of domestic violence and that she requires an FRO for protection against defendant. We agree.

7

Our scope of review of Family Part orders is limited. <u>Cesare v. Cesare</u>, 154 N.J. 394, 411 (1998). We owe substantial deference to the Family Part's findings of fact because of its special expertise in family matters. <u>Id.</u> at 413. However, we owe no special deference to the trial judge's "interpretation of the law and the legal consequences that flow from established facts . . . ." <u>Manalapan Realty, L.P. v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995) (citing <u>State v. Brown</u>, 118 N.J. 595, 604 (1990); <u>Dolson v. Anastasia</u>, 55 N.J. 2, 7 (1969); <u>Pearl Assurance Co. Ltd. v. Watts</u>, 69 N.J. Super. 198, 205 (App. Div. 1961)).

Before granting an FRO, a trial judge must find, by a preponderance of the evidence, that a defendant engaged in conduct that would fit the definition of one or more criminal statutes, and that the entry of an FRO is required for the victim's protection. <u>Silver v. Silver</u>, 387 N.J. Super. 112, 125-26 (App. Div. 2006). In her TRO, plaintiff alleged defendant had committed the offenses of assault, terroristic threats and harassment – all are predicate acts, which, if proven, constitute domestic violence under the PDVA. N.J.S.A. 2C:25-19(a)(2) to (3), (13).

A simple assault occurs when a person "[a]ttempts to cause or purposely, knowingly or recklessly causes bodily injury to another . . . ." N.J.S.A. 2C:12-

1(a)(1).  Here, plaintiff testified defendant pulled her off the couch, dragged her into a bathroom and pushed her several times against a wall, striking her head each time.  She also described defendant strangling and choking her and leaving scratch marks on her chest from his fingernails.  Plaintiff's niece witnessed defendant dragging her aunt into the bathroom and heard plaintiff's body hitting the wall.

When the niece went into the bathroom immediately after the altercation, she saw the bruises and scratches on plaintiff and took photographs of the injuries.  Moreover, defendant admitted he dragged and pushed plaintiff into the bathroom.  He had no explanation for her bruises.  In reviewing the photographs, the trial judge noted the red areas on plaintiff's chest and neck, and the bruising on her arms.  We are satisfied plaintiff presented overwhelming evidence of the predicate act of an assault.[2]

In dismissing the TRO, the judge rejected the photographic evidence of the assault and plaintiff's account of the events.  Although the judge admitted the photographs into evidence, finding plaintiff had laid a proper foundation for

_____

[2]  Because of our conclusion, we need not reach the remaining alleged predicate acts.

A-4864-18T2

them, she questioned the legitimacy of the photos because they were time-stamped at 10:14 a.m.

However, plaintiff's niece testified she had taken the photographs directly after the assault and forwarded them to her aunt several hours later when plaintiff went to the police station for a TRO. The niece's testimony regarding the photographs is corroborated by plaintiff's account of the events and by the time-stamped photographs received on plaintiff's phone.

The judge also disregarded plaintiff's testimony because she found "it doesn't ma[k]e any sense" that plaintiff did not go to the police until several hours later after she had taken her children to school. The judge's comment is not supported by the record. It was understandable that plaintiff would not go to the police station and report the incident at 2 a.m. She did, in fact, promptly report the incident the following morning after taking her children to school.

Having found plaintiff established a predicate act of domestic violence, we turn to plaintiff's need for an FRO to prevent further abuse. Based on her conclusion that plaintiff had not proven a predicate act, the trial judge did not make any findings of whether an FRO was required for plaintiff's protection. While ordinarily we would remand for such findings, we are convinced that,

10

applying the law to the facts presented at trial, an FRO is necessary under these circumstances.

Plaintiff testified to a decade-long period of violence and abuse. She had previously applied for and received a TRO. She stated she felt in immediate danger of harm and was afraid defendant would continue to be violent toward her. We are satisfied there was sufficient evidence to require an FRO to protect plaintiff from future acts of domestic violence.

We, therefore, reverse and remand to the trial court for the entry of an FRO with appropriate protections.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4864-18T2